## COMMONWEALTH *v.* MOLTZ.

| 10 | 527 |
|---|---|
| 126 | 374 |
| 10 | 527 |
| 147 | 526 |
| 10 | 527 |
| 210 | 161 |
| 10 | 527 |
| 214 | 607 |

A decree of confirmation by the Orphans' Court on an auditor's report of the settlement of a guardian's account, is conclusive as to his liability to the ward.

But his administrators are not liable on their official bond for such a debt until they are fixed with a *devastavit*.

When a party is estopped by acts *in pais*.

In error from the Common Pleas of Cumberland.

So far as the facts could be gathered from the paper-book, it would seem that the case was this : The action was brought against the administrators of Moltz, on their official bond. He had been the guardian of the plaintiff's wife. Within three months after she came of age, she gave him a receipt for $728.10 in full, as guardian. He died in 1838, and the defendants settled their accounts as administrators, and distributed the estate without taking refunding bonds. The ward married in 1842. In 1844, to a petition to settle a guardianship account, they answered that they

had distributed the guardian's estate the year before, and they believed the petitioner's account was settled, as evidence of which they exhibited the receipt. A citation issued, and a report was made. This was set aside, but that decree was reversed. The matter was again referred to auditors, who reported a balance due by the intestate, as guardian, after crediting the amount of the receipt of $1,972, which report was confirmed in 1845.

This action was then brought. The court entered judgment for the defendants.

Two classes of objections appeared to have been taken. 1. Errors in the report of the auditors, among which was included the defence to the action arising from the fact that the defendants, finding the receipt among their intestate's papers, had gone on to distribute without objection by her. The bar of the statute of limitations. 2. That defendants were not liable until a *devastavit* was proved.

*Reed*, for plaintiff in error.

*Graham* and *Biddle*, contrà.—An action does not lie on the bond until the administrators are fixed for the debt by a previous suit: 1 W. 437. The lands of the intestate are discharged by not bringing suit within five years. After the ward came of age, the liability of the guardian was a common debt, and barred by the statute in six years: 6 W. 381; 1 Pa. 382; 2 W. 295; 4 W. & S. 557. The plaintiffs are estopped by the receipt and the acts of the defendants on the faith of it: 3 T. & R. 283; 10 Ib. 144; 13 Ib. 304; 7 W. 168; 1 Greenl. Ev. § 207.

*June* 18. BELL, J.—A guardianship account has been settled, against the representatives of the deceased guardian, under the authority and direction of the proper tribunal. The auditors appointed for the purpose, after a full hearing of both parties, reported there was due from the estate of the late guardian, to his ward, the sum of $1,972.19, after allowing the guardian a credit for the receipt of June 8, 1835. The account, thus reported, was confirmed by the court on the 12th of December, 1845. This act of confirmation is equivalent to a decree, that the sum ascertained by the auditors, was due and payable to the ward, by her late guardian in his lifetime. In this particular, it is unlike the decree in Foulk *v.* Brown, 2 W. 214, for there the object was, to ascertain the general balance in the hands of the executors, and not how much was due to the legatees, under the will of the testator; a subject of which the Orphans' Court had then no jurisdiction. In this instance, the Orphans' Court, in the exercise of its general

powers, might have compelled payment of the amount found to be due, by the representatives of the deceased guardian, just as it could have enforced payment by himself, were he living: Bowman *v.* The Executors of Herr, 1 P. R. 282; unless, indeed, there be something peculiar in the case, prohibitory of the exercise of this authority. The leading inquiry then is, whether, under the facts disclosed by the evidence, the defendants, as administrators of Jacob Moltz, are at all liable to answer to the plaintiffs; and, secondly, if so, whether a recovery can be had against them in this action.

The defendants, by the course of their argument, seemed disposed to deny the indebtedness of their intestate. But this is not permissible in this proceeding. Upon that point, the decree of the Orphans' Court is conclusive, until it be reversed or modified on appeal. No such appeal has been taken, and, consequently, nothing can be heard in impeachment of the account accepted and confirmed.

The defendants next set up the statute of limitations as a bar to the plaintiffs' recovery. But, to say nothing of the decree, which is in the nature of a judgment, and therefore not within the act, the case presents a direct and express trust, over which, in the first instance, the Orphans' Court has exclusive jurisdiction. The act has no terms that can be made to embrace claims of this character. This has been so repeatedly settled, that it is only necessary to refer, among the multitude of cases, to Thompson *v.* McGaw, 2 W. 161; Doebler *v.* Snaveley, 5 W. 225, and Patterson *v.* Nichol, 6 W. 379. It is obvious, this defence would not be open to the guardian, were he alive, nor is it more available to his personal representatives; for none of the statutes that have relation to remedies for the recovery of a decedent's debts, are applicable here. It is obvious, then, there is no such *laches*, from the mere running of time, as could operate to bar the claim of the ward against her living guardian. Were he in existence, nothing that has been suggested in the progress of the investigation, could shield him from the successful attacks of the plaintiffs. It is almost needless to say, that after Say *v.* Barnes, 4 S. & R. 112, and other like cases, which frown upon voluntary settlements made with and releases procured from wards, shortly after their minority, the receipt of the 8th of June would afford scarcely a cob-web resistance. Indeed, it would afford none, for it is convicted of gross error, if not stamped with fraud, by the report of the auditors and the decree of the court. One effect of this, is to set the receipt aside, as entirely worthless for proof of the value of the ward's estate in the hands of the guardian.

Were, then, Jacob Moltz before us, he would stand utterly de-fenceless. In the present state of the record in the Orphans' Court, nothing but his insolvency would defeat the claim of the ward.

Do his administrators occupy a more favourable position? As the plaintiff's have, *primâ facie*, an undoubted legal right, the defendants must be able to answer this question very clearly in the affirmative, ere they can hope to escape.

They place their defence upon the following grounds: That, in 1835, the ward, who had shortly before attained full age, settled with her guardian, and, on receiving from him $728.10, gave him a receipt in full; that he died in 1838, leaving that receipt among his papers, and which afterwards came to the hands of his adminis-trators, who, in August, 1843, settled a final account of .their administration, ascertaining, for distribution among the heirs of the decedent, the sum of $2347.24, which sum was shortly after accord-ingly distributed by the administrators, without requiring refunding bonds; that the ward was married in 1842, and, though she and her husband must have known the estate of her late guardian was in course of administration, no notice was given of her claim until April, 1844, and after the distribution of the balance in the hands of the administrators. They claim to have relied on this silence and the receipt of the ward, in neglecting or declining to take re-funding bonds from the distributees; but of this there is no proof, beyond their assertion. Do these enumerated facts estop the ward from claiming the sum ascertained to be due to her, from the administrators of the guardian?—for, if they operate at all, it must be by way of equitable estoppel, springing from matters *in pais*.

It is not to be questioned, that, both in England and this country, the courts have of late years given to the doctrine of estoppel *in pais* a much wider scope than was formerly allowed, founding themselves in equitable considerations. In pursuance of this policy, it is now established that, in all cases where an act is done, or a statement made by a party, the truth or efficacy of which it *would be a fraud* on his part to controvert or impair, the character of an estoppel shall be given to what would otherwise be mere matter of evidence: Stephens *v.* Baird, 9 Cow. 274; Dewy *v.* Field, 5 Met. 381; Congregation *v.* Williams, 9 Wend. 147. In the application of this general rule, Lord Denman, in Pickard *v.* Sears, 6 A. & E. 469, declared, "the rule of law is clear, that, where one, by his words or conduct, wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position,

the former is concluded from averring against the latter, a different state of things, as existing at the same time." This principle was recognised in Gregg *v.* Wells, 2 P. & D. 296; 10 Ad. & El. 90; and Coles *v.* Bank of England, 10 A. & E. 437. To the same effect, though somewhat more strongly expressed, is the definition of a modern or equitable estoppel *in pais*, given by Mr. Justice Cowen in Dezell *v.* Odell, 3 Hill, 219, as " an admission intended to influence the conduct of the man with whom the party is dealing, and actually leading him into a line of conduct which must be prejudicial to his interest, unless the party estopped be cut off from the power of retraction." Our own cases proceed upon the same idea. Thus, in Nass *v.* Vanswearingen, 10 S. & R. 146, it was declared, that a party who stands by at the sale of his property, though under a void authority, and *encourages* purchasers to bid, is guilty of a direct *fraud*. In such a case, a trust arises in favour of the purchaser *ex maleficio*, which chancery may execute. So if one, at a sheriff's sale of his lands, declares a certain tract to be included in the levy, and thereby the purchaser was induced to purchase, it gives him an equity that chancery will enforce, though the declaration was made under a misapprehension: Buchanan *v.* Moore, 13 S. & R. 304. And the effect is the same if one, seeing another acting under a delusion, stands quietly by, without giving notice of his superior right: Epley *v.* Witherow, 7 W. 165; Carr *v.* Wallace, Ibid. 400. In all these cases, there is some ingredient which would make it a fraud in the party to insist on his legal right: per Sergeant, J., in Crest *v.* Jack, 3 W. 238. It is the presence of this fraud, either in the intention of the party, or the effect which would be worked by permitting him a negation, that distinguishes this species of estoppel, from what was so considered by the old common law. But it is obvious there can be no such fraud where the purchaser or other actor was, or ought to have been, acquainted with the subject of his action, or even had the means of knowledge and neglected to avail himself of them: Hepburn *v.* McDowell, 17 S. & R. 383; or where the silent person was himself unacquainted with the important fact uncommunicated; or where the party was not influenced to act on the faith of the false suggestion, or silence of one bound to speak; or where no injury has, in fact, arisen from the declarations or conduct complained of: Wallis *v.* Truesdell, 6 Pick. 455; Whitney *v.* Holmes, 15 Mass. 152; Miller *v.* Cresson, 5 W. & S. 284; Welland *v.* Hathaway, 8 Wend. 480–2. To the constitution of this species of estoppel, at least three ingredients seem to be necessary; first,

misrepresentation, or wilful silence by one having knowledge of the fact; second, that the actor, having no means of information, was, by the conduct of the other, induced to do what otherwise he would not have done; and, thirdly, that injury would ensue from a permission to allege the truth.    And these three things must appear affirmatively.

In the case in hand, the injury feared by the defendants, in the event of a recovery, will, if it be felt at all, flow immediately from their neglect to exact refunding bonds from the distributees of the estate administered by them.    To require such bonds is made their duty by the act of 1834.    Had this duty been performed, there would have been no room whatever to question the plaintiffs' title to recover.    Now, how far one derelict of duty, from which the injury apprehended must immediately spring, can aver it as a bar against another, not immediately active in inducing it, may admit of much doubt.    It is not necessary to discuss it here, for the defence set up must fail on other grounds less doubtful.

Barbara Oliver, the late ward, is proved to be so illiterate as to be unable to read or write the English language.    It is evident the friends and relatives by whom she was surrounded, previous to her marriage, were but little, if any, better instructed.    She married in June, 1842; and in April, 1844, her husband, the present plaintiff, instituted the proceeding, of which the present suit is the sequel.    Now, how can we undertake to say that, prior to that time, and even before the distribution of the fund in the hands of the administrators, he or his wife knew of the facts subsequently developed?    If we look to the result of that developement, as compared with the guardian's voluntary statement submitted to her, it is scarcely to be denied a fraud was committed upon her, or, at least, she was grossly deceived.    When did she make the discovery of this fraud or deceit?    The defendant has not proved it was before the distribution of the intestate's estate.    How can we aver it was?    Probably, if the exact truth were known, it would turn out the discovery of a deficiency, to some extent, was won only by dint of inquiry, on the part of the husband, awaked to action by the dawn of some vague suspicion, which ripened not into certainty until the first report of the auditors.    But it is enough that it is not shown when the knowledge was attained to by the plaintiffs.    In this particular, the defence, founded on estoppel, differs from a plea of the statute of limitations, which, by positive law, the mere lapse of time creates a flat bar, and it is, therefore, incumbent on the party who would take his case from under the operation of the act, to prove the exception.    But he who avers an estoppel, either by

pleading or evidence, must establish by proofs, positive or circumstantial, every fact that essentially enters into the character of such a reply to the plaintiff's suit. It is to be considered that the doctrine of estoppel is an exception to the general rule for the prevention of fraud, and is not to be extended beyond the reasons on which it is founded : 1 Greenl. Ev. § 204.

Then as to the ward's receipt of June, 1835 : There was certainly misrepresentation in this ; but who was the party concocted it ? Certainly not the ward. She trusted entirely to the guardian, and he deceived her. But it is said, she and her husband, knowingly, left it in the hands of the administrators, whereby they also were deceived. How does that appear ? The road of inquiry was as open to them as to her. And, were this otherwise, how is it made manifest they were influenced, by the receipt, to neglect a positive duty ? All the difficulty felt originates here ; and there is nothing to show the omission is at all ascribable to the plaintiffs. They had no control over it—they could neither command nor advise. There is the utter absence of proof that the action of the administrators was at all dependent on their course. One was entirely independent of the other, and it would, therefore, be dangerous to say one was influenced by the other. It is not even so asserted in the answer of the administrators to plaintiff's petition in the Orphans' Court. In all this, there is the absence not only of fact, but of the precision necessary to make an estoppel. But here the defendants are again met by the objection before considered. When did the plaintiffs discover the falsity of the receipt? That it was known to the intestate, from the beginning, would seem certain. That it was not so known to the ward is also certain. Of course there was no such default as will estop her, until at least she was in possession of the fact ; and the inquiry constantly recurs, when was this ?

Yet the plaintiffs cannot recover in this action. A decree has been procured against the administrators, in the nature of a judgment. But no steps have been taken to charge them with a *devastavit*. Without this, it is settled by The Commonwealth v. Evans, 1 W. 437, and the cases there cited, that the non-payment of a debt by the administrator, is not such a breach of the condition of his administration-bond, as will enable the creditor to sue on it, and recover his debt. We are, therefore, reluctantly compelled to turn the plaintiffs round to another action. Upon this point, and this alone, the judgment rendered below is to be affirmed.

Judgment affirmed.