## Smith *et al. versus* Brotherline.

1. A counsel or attorney employed and consulted as such, to draw a deed, or an application for an original title for land, is in the line of his profession, and is precluded from buying in for his own use any outstanding title.

2. The relation of the attorney in such case to his client is confidential, and, whether he acts upon information derived from him or from any other source, he is affected with a trust.

3. This rule is on the ground of policy, not of fraud, and prevails although the attorney be innocent of any intention to deceive, and he act in good faith.

4. When the attorney buys a title outstanding or adverse to land as to which he has been consulted or employed, he buys for his client, if the client so elect.

5. The client must reimburse the outlay and costs of the trustee, unless in a case of manifest fraud.

6. A sale for taxes by the treasurer could not convey title beyond the then ascertained lines of his county, and subsequent changes of the county line would not enlarge the right of the purchaser.

7. Cambria county was erected in 1804, and commissioners directed to locate the lines; in 1849, by Act of Assembly, G. and V. were appointed commissioners to establish one of the lines, file their report, &c., which they did; there was some evidence of the survey of a line previously. The court properly instructed the jury, that if there was no other line than that indicated by the act creating the county, the fixing that line by G. and V. should be regarded as indicating where it was and had been, unless there was evidence showing that at the treasurer's sale the officers of the county recognised another.

8. A verdict in ejectment may describe a tract by reference to something of a permanent and public nature, as a recorded deed or diagram, &c.

9. If the verdict enable the court to give judgment, and the sheriff to execute an habere facias, it will not be disturbed.

10. The public recorded boundary line of a county falls within these principles.

October 25th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Cambria county :* No. 135, to October and November Term 1868.

This was an action of ejectment brought, May 22d 1860, by John Brotherline against John R. Smith, Anthony Swires and others for "two tracts of land situate in Clearfield township, Cambria county, one surveyed in the name of James Bryson, containing 200 acres, the other in the name of John Mease, containing 200 acres," &c.

On the trial, June 9th 1868, before Taylor, P. J., the plaintiff gave in evidence—Warrant to John Mease and survey, August 23d 1794, for 433 acres in Huntingdon county, adjoining John Harrison on the west; and patent to William Barton, February 24th 1796, for same tract. Warrant to James Bryson and survey, August 28th 1794, for 438 acres in Frankstown township, Huntingdon county, adjoining Samuel Bryson on the east; and patent to William Barton, February 25th 1796, for 433 acres, "tract in the name of James Bryson;" assessment of taxes for the years 1821 and 1822 on these two tracts separately as unseated; deeds, acknowledged December 31st 1822, from the treasurer of Cambria county, to William Baird and Henry Barclay for these two tracts as sold for taxes; proceedings, October 23d 1854, in the Supreme Court of New York, vesting the legal title to these lands in Murray Hoffman, Jr., in trust. Articles of agreement, May 5th 1856, between Hoffman and Brotherline, the plaintiff, by which Hoffman "agreed to sell to the said John Brotherline, all that part, or portion, of a certain tract of land situate partly in Antis township, Blair county, and partly in Clearfield township, Cambria county, surveyed to 'John Mease,' which was not sold by a certain Henry Barclay in his lifetime to D. Caldwell—comprising, it is supposed, 330 acres, be the same more or less, which land is now in the occupancy of the said John Brotherline, he having erected thereon a steam saw-mill, plank dwelling-house and other buildings," for $1000, and on payment, Hoffman to make a deed to plaintiff. Articles of agreement, July 28th 1856, between Hoffman and plaintiff, by which Hoffman "agreed to sell to the said John Brotherline, the following described tracts or pieces of land, situate partly in Blair and partly in Cambria county, to wit: All that part of the 'James Bryson' tract, that is not interfered with, by the tract 'Jesse Kelley;' also all that part of the tract 'Samuel Bryson,' or Bryon, that is not interfered with by the tract Jesse Rex, comprising in all, as is supposed, about 433 acres," for $1000, and on payment, Hoffman to make a deed to the plaintiff. The payment of the purchase-money by the plaintiff to Hoffman was proved. The plaintiff here rested.

The defendants gave in evidence—Application of John R. Smith, viz.: "John R. Smith, of, &c., applies for 400 acres of land situate in Antis township, Blair county, and Clearfield township, Cambria county, Pennsylvania, adjoining lands included in the survey of Benjamin R. Morgan on the east and on the south,

[Smith v. Brotherline.]

and lands included in the survey of ——— Barton on the north and on the west; on which said tract of land there is an improvement erected and occupied by the subscriber since the 27th day of November, A. D. 1852.

" To the Surveyor-General          JOHN R. $\times$ SMITH.
of Pennsylvania.                          mark.
            10 per cent. Int. 27th Nov. 1852.

" Witness: John Brotherline.

" Blair County, ss.   Before us the subscribers, justices of the peace in and for said county, personally appeared Israel Swartz and James Smith, disinterested witnesses, who being duly sworn, say that the land described in the above application was first improved in the year 1852 and not before; and that John R. Smith, the above named applicant, has resided thereon since the 27th day of November, A. D. 1852.

                                                    . his
" Sworn to and subscribed before us,        ISRAEL $\infty$ SWARTZ.
the 21st day of December, A. D. 1853.            mark.
            JOHN COX, J. P.              JAMES SMITH.
            SAML. SMITH, J. P.

" Blair County, ss.   Before me, the subscriber, one of the justices of the peace in and for said county, personally appeared John R. Smith, the above-named applicant, who being duly sworn according to law, saith: that no warrant or other office right has issued for the land described in the above application, either in his own name or the names of any other person or persons under whom he claims the same, to the best of his knowledge and belief."

Warrant January 10th 1854 for " 400 acres of land, improved, adjoining," &c. (as in the application); survey on the above warrant June 28th 1864 for 300 acres, 10 perches; patent August 7th 1865 for same land, described by courses and distances, Benjamin R. Morgan and ——— Barton being mentioned as adjoiners. James Smith testified that twenty-two or twenty-three years previously Israel Black occupied the land; in December 1853 witness went to Holidaysburg with John R. Smith (the defendant), to Mr. Brotherline's; John told him " he wanted to take out an application for the land he is now on; Mr. Brotherline agreed to do the business; he wrote the application, and lent John $100 to pay for the land warrant; Israel Black and myself went bail; Mr. Brotherline said he would send the papers off to the land office and the money along; Brotherline had not been on the land; he made inquiries what kind of land this was of John's, and what kind of timber this was on adjoining land; John was living on it at this time; built a house and stable on it afterwards; he cleared about five acres after the application was made; house would cost between $200 and $300; he put a good fence around what he cleared; he built house the year the

application was made, or the year following; John went there in 1851 or 1852."

The defendant then gave in evidence an agreement dated March 23d 1852, by which Israel Black sold to "John R. Smith all that improvement situate in Clearfield township, Cambria county, containing about 400 acres, lying on the Allegheny Mountains, joining lands on the south by R. Morgan, on the west land of others, on the east by land of James Smith."

James Smith further testified: The note to Brotherline was given to raise money to pay for the warrant; John went to Brotherline to employ him as attorney to make application for the warrant. The defendant gave evidence that the plaintiff was taxed on the seated list of Clearfield township for forty years from 1862 to 1866, including both years, and that John R. Smith was taxed on the same list for 200 acres from 1858 to 1866, both inclusive, and rested.

The plaintiff then gave evidence of assessments in the names of James Bryson and Mease in Allegheny and Clearfield townships from 1808 to 1846, inclusive, except 1816 to 1819, 1828 to 1830, 1840 to 1842.

James L. Gwin testified: I assisted to run county line in 1849 between Blair and Cambria counties; Mr. Vickroy was along; commenced at corner of Centre county; we passed through James Bryson and John Mease; Bryson appears to be divided about equally; what is left by the Jesse Kelley; Kelley is all in Blair except three acres; about 100 acres of the John Mease is in Cambria county. (Draft shown). I got this draft from Herman Haupt; I think it is a correct copy of the official draft; we run in part on original line; old line took more off Cambria county, run more westward; my impression is, and always has been, that we took more land into Blair county; we believed we had a right to place the line where we thought it ought to be; I think at Bell's Run we went further west than old line.

The draft was given in evidence, also a diagram of Cambria county, which was found in the office of the clerk of the Quarter Sessions, and marked filed July 5th 1822, confirmed December 31st 1822, and appeared to have been made by William O'Keefe. It showed what is called the old line. There was evidence of other lines being the county line.

Cambria county was created out of Somerset and Huntingdon counties by the Act of March 26th 1804, which directed that the line should be run "from the southerly corner of Centre county, to run southerly along the Allegheny Mountains to the Somerset and Bedford county line." By the act, commissioners were to be appointed by the governor to run the line; there was no evidence that this had been done. On the 29th of March 1849, an Act of Assembly was passed appointing James L. Gwin

[Smith v. Brotherline.]

and E. A. Vickroy " correctly to run and distinctly mark the boundary line or lines between the counties of Blair and Cambria agreeably to the Act of Assembly defining the boundaries of said counties."

The commissioners were further directed to transmit a copy of their report to each of the counties, which was done.

The court, after stating the evidence relating to the original titles of the parties, said : * * " It is thus clear that the defendant's title in evidence cannot prevail against the Barton title, but, in the comparison, must yield to it. This is so clear that it has not been questioned. Defence, however, is made and rested upon two grounds, which, without denying the superiority of the Barton title, deny the right of the plaintiff to avail himself of it in this controversy : first, because it is alleged the James Bryson and John Mease surveys, when assessed and sold for taxes to Bayard and Barclay, in 1822, lay in Huntingdon county, and were not subject to sale in Cambria county, and that the sale was void and passed no title ; and, secondly, because John Brotherline, the plaintiff, it is alleged, is shown by the evidence to sustain a professional relation to John R. Smith, one of the defendants, with respect to the title, which precludes him from deriving any benefit from the Barton title ; or that he did, in the procurement of the title of Smith, that which estops him from disputing it, or denying its validity. And we proceed to examine and consider those two leading points in the defence, reversing the order in which the propositions have been stated." * *

The judge then referred to the evidence bearing on this proposition, and continued :—

" Brotherline was an attorney at law. He was employed, we may say and assume, in his professional capacity to write the application for the warrant, and did it, and advised in relation to it in his office at Hollidaysburg. He was employed and acted professionally in obtaining the warrant for the land represented in the application and warrant ; and he could not at any time afterwards, without the consent of Smith, purchase and hold another title for the same land, and avail himself of it ; but such purchase, if made afterwards, would be regarded as for the benefit of Smith. But there must be some limit to the application of the rule. It seems clear to us that it could only apply to the land in relation to which the professional advice and assistance had been rendered. [It would not surely be pretended that, because Brotherline drew the application for the 400 acres Smith applied for, and loaned the money to purchase the warrant, he would be prevented from purchasing any *other* tract of land in Blair or Cambria county to which Smith might set up a claim, even upon his warrant and survey.]

" Now, it will be remembered that Brotherline knew nothing

12 P. F. SMITH—30

about the land at the time of the application except what he learned in his office in Hollidaysburg from John R. Smith. The representation then was, that it was vacant land—vacant land adjoining the Barton lands, recognising the Barton lands as existing surveys. It will be remembered also that the warrant, following the description contained in the application, was issued for vacant land adjoining the Barton surveys. [It will be remembered, too, that this warrant was not laid by Smith on the ground so as to indicate or give any notice of any intention to apply it to any land other than that described on its face until 1864; that in 1856, eight years before, Brotherline had contracted to purchase the parts in controversy of two of the Barton surveys, land called for by Smith's warrant as adjoining the land to be surveyed in pursuance of it, and for which the warrant gave notice to every body there was an existing title out of the Commonwealth known as the Barton surveys. All the facts, thus far, really go to negative the idea that there was or could be any conflict between the title of Smith and the purchase made by Brotherline.] [Is there anything in the whole transaction to show that Brotherline was employed in procuring for Smith land which everything produced here in the defence plainly shows was regarded by all parties at the time as within old, known and acknowledged surveys? Could it be pretended that the land which the defendant Smith applied for in 1852 was the same that the plaintiff purchased in 1856?—or that the latter behaved with any unfairness or want of integrity, or in violation of any professional confidence in the whole transaction? While the application and warrant do not claim, but plainly exclude the land in controversy, there was no attempt to appropriate it by the execution of the warrant until eight years after the plaintiff's purchase.] [We think, therefore, that the rule invoked has no application in view of the plain and undisputed facts of this case. But, assuming that it does apply, the result of its application is, not to extinguish the superior title which the attorney may have purchased, but to make him a trustee for his client; in other words, the title purchased enures to the benefit of his client, and the client may claim that it was purchased and is held for him; but to do so, it is equally clear and well settled he must reimburse or tender what the attorney or trustee paid for it, in order to avail himself of the benefit of the purchase. It is not, indeed, necessary to place himself in a position in which he may demand it, that he should give previous notice, or at any particular time tender the money or bring it into court. It is enough if, on the trial of the cause, he brings it into court; but that at least he must do. And that is here not done. It is only urged against the application of this admitted principle, that the status of the *plaintiff* does not entitle him to insist upon it. But we do not think so. It is one of the principles or rules

[Smith *v.* Brotherline.]

of equity, regarded as part of our common law, and applied on the trial of all civil cases, which are viewed in all their legal and equitable bearings at the same time. A plaintiff as well as a defendant, if it will aid him, may avail himself of any principle or rule of equity; when he does so, he must show that he has done, or is ready to do, everything which in good conscience entitles him to avail himself of the equity, whether plaintiff or defendant. The question is not what his status is upon the record, but whether he is entitled to the benefit of the rule of equity, of which he seeks to avail himself. If he seeks such benefit he has only to bring himself and be where he may claim it. How do these parties stand? The plaintiff claims upon the Barton title, in comparison with which any title shown by the defendants is not worth a straw. But the defendants allege that the plaintiff purchased the Barton title under such circumstances that he holds it as a trustee for them. If so, to claim the benefit of it here, they should have here in court for the plaintiff the money which he paid for it; and this he has a right to demand. For the two-fold reason stated, we therefore dismiss this branch of the defence. It is not, in any view of it, tenable.]

["With respect to the claimed conclusion that Brotherline is estopped here from denying or controverting the title of Smith because he loaned the money to procure it, there is no controversy about the facts. The money, we have seen, was loaned to pay for *vacant land*, and not the land which the plaintiff afterwards purchased; and if there was anything discreditable to the plaintiff in that transaction, which we cannot perceive, it was still a transaction which did not apply to the land here in controversy; and we instruct you that he is not thereby estopped from asserting his claim, in his position upon the record.]

"II. We come now to the other general ground of defence: that the Bryson and Mease survey, at the time of the treasurer's sale in 1822, lay in Huntingdon county.

"Our impression is, that the county line, run in any of the places it is claimed to be, would divide both of these tracts." * *

"There is no controversy here representing *the law* upon this general question. It is agreed that the officers of one county cannot sell land lying in another for taxes; and that it is only such portions of these tracts as were within the lines of Cambria county that could be or were sold by the officers of that county in 1822. Nor is it disputed that the title to the portion of each then lying in Cambria county, if there was any, would pass by the tax sale to the purchaser. [And as the evidence here as to where precisely the county line was—which is a question of fact for you —shows that in any view of that evidence some portion of these tracts lay in Cambria county; that portion, whatever it was, the plaintiff is entitled to recover, assuming him to have shown a

[Smith *v.* Brotherline.]

primâ facie case, and the other general ground of defence having failed, as we explicitly instruct you.]   Then what is the plaintiff entitled to recover?   All the land in dispute lying in Cambria county at the time of the treasurer's sale.   Where was the line then?   It is the line at *that time*, we instruct you, that would govern.   There is no difficulty in ascertaining where the line is since run by the commissioners appointed under the Act of 1849 to run and mark it.   The question is, whether that indicated where the line was, and where it was regarded to be by the officers of Cambria county in 1821 and 1822.   The plaintiff here is entitled to recover the land embraced in the survey of Bryson and Mease, lying within the county of Cambria in 1820 and 1822, and you must determine that by ascertaining where the county line then was. If your conclusion should be, that the line run by the commissioners in 1849 indicates where the line had been, then you can fix the amount by referring to that line in your verdict.   If you find any other line, then you will refer to it specifically in your verdict, so that it will be certain and can be carried out." * *

The verdict was " for plaintiff for all the land  lying in Cambria county down to the line established by Mr. Gwin and E. A. Vickroy in the year 1849." The defendants moved in arrest of judgment, because the verdict was void for want of certainty. The motion was overruled, and judgment entered on the verdict.

The defendants took a writ of error, and assigned for error the portions of the charge enclosed in brackets and the refusal of the court to arrest the judgment.

*G. M. Reade*, for plaintiffs in error.—Brotherline was estopped by his acts : 1 Greenl. on Evid., § 207 ; McKelvy *v.* Tinley, 4 W. & S. 323 ; Commonwealth *v.* Moltz, 10 Barr 530 ; Elder *v.* Reel, antea, p. 307 ; Fulton *v* Moore, 1 Casey 468 ; Maple *v.* Kussart, 3 P. F. Smith 348 ; Millinger *v.* Sorg, 5 Id. 215 ; Hallett *v.* Collins, 10 How. 174.   Such acts estop, whether intentional or innocent : Cornish *v.* Abingdon, 4 H. & N. 556.   The possession of land is notice of every title under which the occupant claims : Krider *v.* Lafferty, 1 Whart. 303 ; Woods *v.* Farmere, 7 Watts 382 ; McColloch *v.* Cowher, 5 W. & S. 427 ; Green *v.* Drinker, 7 Id. 440 ; Hood *v.* Fahnestock, 1 Barr 470 ; Kerr *v.* Day, 2 Harris 112.

Inaccuracy of statement of fact by the court to the jury is ground for reversal : Brown *v.* Clark, 2 Harris 469 ; Walker *v.* Humbert, 5 P. F. Smith 407.   Smith was in possession, and Brotherline had notice of the fact.   Smith's title was therefore good against him : Rowland *v.* Long, 1 Harris 464.   Brotherline was not entitled to have a tender of the money paid him ; he had deceived Smith : Hockenbury *v.* Carlisle, 5 W. & S. 348 ; Beaupland *v.* McKeen, 4 Casey 124 ; Leisenring *v.* Black, 5 Watts

[Smith v. Brotherline.]

303; Eberts v. Eberts, 5 P. F. Smith 110; 1 Story's Eq. Jur., § 218; Hill on Trustees 160. The defendants could not tender, because they did not know what was the agreement with Hoffman, nor how much land lay in Cambria county. The verdict refers to no natural boundary, nor to a monument, &c. The verdict was too uncertain: Smith v. Jenks, 10 S. R. 153; Martin v. Martin, 17 Id. 431; Stewart v. Speer, 5 Watts 79; O'Keson v. Silverthorn, 7 W. & S. 246; Harrisburg v. Crangle, 3 Id. 460; Hunt v. McFarland, 2 Wright 69.

R. S. Johnson, for defendant in error.—As to tender: Galbraith v. Elder, 8 Watts 81; Cleavinger v. Reimar, 3 W. & S. 486; Henry v. Raiman, 1 Casey 354. The locality of the county line was properly submitted to the jury; Kinley v. Crane, 10 Casey 146; Hecker v. Sterling, 12 Id. 423. The verdict was sufficiently certain: Santee v. Keister, 6 Binney 36; Green v. Watrous, 17 S. & R. 393; Tyson v. Passmore, 7 Barr 273; Ewing v. Alcorn, 4 Wright 492; Miller v. Casselberry, 11 Id. 376.

The opinion of the court was delivered, May 5th 1870, by

SHARSWOOD, J.—The principle of law invoked by the plaintiffs in error is happily settled and clear above and beyond all contention. A counsel or attorney, employed and consulted as such to draw a deed or an application for an original title for land, is in the line of his profession, and is precluded from buying in for his own use any outstanding title. The relation between him and his client is confidential, and whether he acts upon information derived from him or from any other source, he is affected with a trust: Galbraith v. Elder, 8 Watts 94; Cleavinger v. Reimar, 3 W. & S. 486; Henry v. Raiman, 1 Casey 354. This is on the ground of policy, not of fraud; for the attorney may be entirely innocent of any intention to deceive, and act in the most perfect good faith. It is of the utmost importance that men should be able to intrust with entire safety their most secret interests to their professional advisers. Hence the rule is an unbending one, and without exception, that when the attorney buys in a title outstanding or adverse to land as to which he has been consulted or employed, he buys for his client, if the client should elect to take it. The cestui que trust must of course, if he asks the interposition of a chancellor to assist him, do equity by reimbursing the outlay and costs of the trustee, unless it may be in a case of manifest fraud intended and attempted to be perpetrated.

But the evidence in the court below failed to show any case to warrant the application of the principle. Mr. Brotherline was not consulted or employed in regard to the premises involved in this ejectment. They included two of a block of connected surveys known as the Barton Surveys. At the request of John R.

[Smith *v.* Brotherline.]

Smith he drew for him an application to the surveyor-general "for four hundred acres of land situate in Antis township, Blair county, and Clearfield township, Cambria county, Pennsylvania, adjoining lands included in the survey of Benjamin R. Morgan on the east, and land included in the survey of ———— Barton on the west." By the terms of this paper, the Barton surveys were expressly excluded. The plaintiff was not consulted as to the title of the Barton surveys or as to any land included within them. It is true that it is added, "On which said tract of land there is an improvement erected and occupied by the subscriber since the 27th day of November, A. D. 1852." This was inserted to enable the land office to compute the interest due to the Commonwealth on the purchase-money, and to fix incidentally and conclusively as to the applicant the date of the inception of his right by settlement as against any intervening claims. But it now appears that the fact was not as asserted, that the improvement was not erected on the land applied for, but on other land not included—in fact, on a part of the Barton surveys expressly excluded. There is not a spark of evidence, nor is it even pretended, that Mr. Brotherline knew when he drew the application, or afterwards at any time before he purchased the Barton surveys, that the defendant Smith's improvement was upon them. How, then, can it be pretended that he stood in a confidential relation as regards these surveys, any more than if he had bought warranted land one hundred miles off upon which his client had a claim by settlement? The learned judge below took the decision of no question of fact from the jury; for there was no evidence upon which any such question could arise. He might have contented himself with a simple and absolute direction to find for the plaintiff on his paper title. This disposes of all the assignments of error except the 7th, which excepts to the verdict as insensible and void for want of certainty.

The title of the plaintiff below was deduced through a sale for taxes by the treasurer of Cambria county in 1822. He could grant no such title for lands beyond the then ascertained and settled limits of the county, and a subsequent change in them could not enlarge the right of the purchaser. Hence it became a question what was the county line in 1822, as the Barton surveys lay upon the boundary. Cambria county was erected and laid off from parts of Huntingdon and Somerset by the 6th section of the Act of Assembly of March 26th 1804 (4 Sm. Laws 171), and so far as the line in question is concerned, it was therein described as from "the south-westerly corner of Centre county on the heads of Muskakon creek southerly along the Allegheny Mountains to Somerset and Bradford county lines;" and by the 7th section the governor was directed, as soon as convenient, to appoint three commissioners to run the lines. Either this was never done or no

[Smith v. Brotherline.]

record was made of it.    At all events, an Act of Assembly was
passed on March 29th 1849 (Pamph. L. 260), appointing James
L. Gwin, of Blair county, and E. A. Vickroy, of Cambria county,
" to correctly run and distinctly mark the boundary line or lines
between the counties of Blair and Cambria, agreeably to the Acts
of Assembly defining the boundaries of said counties." They
were directed to transmit a copy of their report and plots to the
commissioners of each county.    These duties were performed by
them.    Some evidence was given of a survey of part of the line
previously, but the authority under which it was made did not
appear. No witness could identify any marks on the ground.
The jury were instructed that if there was no other line than that
indicated by the Act of Assembly erecting the county, then the
fixing that line by the commissioners appointed for that purpose
by the Act of 1849 should be regarded as indicating where it was
and had been, unless there was evidence which showed that the
officers of the county at the same time recognised another.    No
error has been assigned on this part of the charge, and the ver-
dict was for the plaintiff " for all the land lying in Cambria county
down to the line established by Mr. Gwin and E. A. Vickroy in
the year 1849."    Now, if the jury had found any other line in
this general way, and referred to by the evidence, oral or written
given on the trial, without describing it with reasonable certainty,
it might have been bad according to Hagey v. Detweiler, 11 Casey
409 ; O'Keson v. Silverthorn, 7 W. & S. 246.    But these cases
recognise it as settled that the verdict may describe a tract by
reference to something of a permanent and public nature, as a
recorded deed or a diagram filed in court, like the draft of a road
in the Quarter Sessions.    Indeed, this court went much further,
and held, in Tyson v. Passmore, 7 Barr 273, that a verdict for
eighty-two and a half acres of land, being the land covered by the
warrant of survey of July 1832, was sufficiently certain.    If the
verdict enables the court to give judgment, and the sheriff to deliver
possession when that is required in a *habere facias possessionem*,
it will not be disturbed.    *Oportet quod res certa deducatur in
judicium,* but *id certum est quod certum reddi potest:* Green v.
Watrous, 17 S. & R. 393.    Now nothing can well be stated more
clearly falling within these principles than the public recorded
boundary line of a county made under an Act of Assembly and
filed with a plot in the office of the commissioners.

Judgment affirmed.