## Knoblauch v. Bankes.

*Ejectment—Writ—Service—Parties—Act of March 21, 1806.*

1. In an action of ejectment, the land sued for must, under the Act of March 21, 1806, 4 Sm. Laws, 332, be described in the writ, and the sheriff is obliged to serve all persons whom he finds in possession of the premises, irrespective of whether or not they are named as defendants in the writ.

2. In an action of ejectment, it is necessary for the plaintiff to show that defendant was in actual possession at the time of the service of the writ of ejectment, or the plaintiff will be defeated; the writ is *prima facie* evidence of such possession.

3. In the absence of a return of the writ, verified by the oath of the sheriff, it is necessary to prove that the defendant was in possession, even though there be an appearance and plea by counsel.

4. The land must be well enough described, either by the writ or proof, to enable the sheriff to deliver it.

5. Where, in an action of ejectment, a map showing a survey by an engineer who swears to its correctness is put in evidence, it is error to decline to submit the case to the jury on the sole ground that plaintiff had failed to put his writ in evidence.

6. In ejectment, after trial and verdict, a record may be amended so that the pleadings shall conform exactly with what was tried.

*Ejectment—Boundaries—Laying out line—Estoppel—Evidence.*

7. Where owners of adjoining lands have staked out a line between their properties and each has improved his own property according to the line so laid down, each is estopped from making any claim upon the ground occupied by the other, although the line may have been established by mistake or through ignorance.

8. Where one advises and encourages another to enter upon, invest his money in, or expend his labor on land with the assurance that he will thereby acquire title to it, such a one will not be permitted afterwards to call in question such title, even though he acted in ignorance of his own right.

Motion in arrest of judgment and for a new trial. C. P. Schuylkill Co., May T., 1926, No. 578.

*V. J. Dalton* and *E. J. Smith,* for plaintiff.

*J. W. Moyer* and *George W. Ryon,* for defendant.

KOCH, J., Dec. 19, 1927.—This action was brought to recover possession of a strip of ground about six feet wide, situate on the southern side of Worman Street, in the City of Pottsville. The defendant's house covers the northern end of the strip for a distance of 44 feet and 3 inches. The strip varies in width and is 89 feet 6 inches long.

All the testimony in the case had been received and was closed at noon on the third day of the trial. When the court reconvened at 1.30 P. M. of that day, counsel for the defendant moved for the direction of a verdict in her favor, "on the ground that the plaintiff had proven by his own agent and witness, Henry Knoblauch, on cross-examination, that ever since he bought the lots in question from John O. McMenamin, he has been and now is in full

and undisturbed possession of the same, and also has failed to show that Mrs. Bankes, the defendant, ever was, or now is, in possession of the same or any part thereof, or in possession of the land described in the writ." After hearing a brief argument of counsel on both sides, we granted the motion and directed a verdict in the defendant's favor on the second ground stated in the defendant's motion, because the plaintiff had not put his writ in evidence. When we had charged the jury so far as to clearly indicate why they should render their verdict in the defendant's favor, plaintiff's counsel interrupted the charging of the jury in order to offer the writ in evidence, but the defendant objected to the offer and it was refused.

Under the circumstances, the request was properly refused after all the testimony had closed and the court had recessed and the witnesses had not been directed to appear again in court. We allowed the plaintiff an exception to our ruling, but we see no sufficient reason for changing that ruling now.

Were we wrong in directing a verdict for the defendant?

The action of ejectment is regulated, in part at least, by statutory law. The form of the writ is specifically provided for by the 12th section of the Act of March 21, 1806, 4 Sm. Laws, 332. The land sued for must be described in the writ, and the sheriff is obliged to serve all persons whom he finds in possession of the premises, irrespective of whether or not they are named as defendants in the writ. "And the return by the sheriff of having served any such writ on the defendants, marked served by him, shall be evidence of such defendant or defendants being in actual possession of the premises or part thereof:" Act of April 13, 1807, 4 Sm. Laws, 476. Section 12 of the Act of March 21, 1806, 4 Sm. Laws, 332, made it the duty of the plaintiff in ejectment "to file in the office of the prothonotary . . . on or before the first day of the term to which the process issued is returnable, a description of the land, together with the number of acres which he claims and declares that the title is in him." And the defendant was required to enter his defense and thereupon issue was to be joined. But section 1 of the Act of June 12, 1919, P. L. 478, provides that: "In all actions of ejectment hereafter to be brought, the plaintiff shall file a declaration, which shall consist of a concise statement of his cause of action, with an abstract of title under which he claims the land in dispute, and, in addition to the plea of 'not guilty' now required by law, the defendant shall file an answer in the nature of a special plea, in which he shall set forth his grounds of defense, with an abstract of the title by which he claims; and no action of ejectment shall be considered at issue until the plaintiff's statement and the defendant's plea and answer shall be filed; nor shall any evidence be received, on the trial of said action, of any matter not appearing in the pleadings, subject to the power of amendment. The several courts of this Commonwealth shall have the power, by general rule or special order, to fix the time within which the defendant shall file his abstract of title," etc.

In an action of ejectment, it is necessary for the plaintiff to show that the defendant was in actual possession at the time of the service of the writ in ejectment, or the plaintiff will be defeated: Cooper v. Smith, 9 S. & R. 26. And the writ is *prima facie* evidence of such possession: Dietrick v. Mateer, 10 S. & R. 151; Gratz v. Benner, 13 S. & R. 110. In the absence of such a return verified by the oath of the sheriff, it is necessary to prove that the defendant was in possession, even though there be an appearance and plea by counsel: McIntire v. Wing, 113 Pa. 67; Kraemer v. Voneida, 24 Pa. Superior Ct. 347. Therefore, the writ is not the only evidence of possession. Verdicts in ejectment are generally "for the premises described in the writ,"

and in such cases the writ must be offered in evidence for the purpose of a verdict, where all the land sued for is recovered. But, if the description in the writ is too vague and uncertain, a general verdict will also be too vague and uncertain to sustain a judgment. The land must be well enough described to enable the sheriff to deliver it: Hunt v. McFarland, 38 Pa. 69. "Whenever a verdict in ejectment is sufficiently certain to enable a court to give judgment and the sheriff to deliver possession, it will be sustained; and its certainty may be in the verdict itself or by reference to something of a permanent and public nature:" Hagey v. Detweiler, 35 Pa. 409. "In ejectment, a verdict must be certain in its description of the premises referred to; if it be a part of a tract of land, it must describe it by reference to something of a permanent and public nature, such as a landmark upon the ground, a recorded deed, or a diagram filed of record with the verdict:" O'Keson v. Silverthorn, 7 W. & S. 246. These doctrines were followed in Smith v. Brotherline, 62 Pa. 461, 471. But in Green v. Watrous, 17 S. & R. 393, a verdict for the plaintiff for a 412-acre tract, deducting 100 acres described in an agreement specified in the verdict, was held sufficiently certain. In Brautegan v. Wilson, 251 Pa. 306, an action was brought for the recovery of a strip of ground claimed by the plaintiff and occupied by the buildings of the defendant. The verdict was for three-fourths of an inch of land at the front on Donner Avenue, running at right angles with disputed land a distance of 100 feet, and was sustained. The verdict was based on the testimony of two engineers. In the case before us, the map showing the survey of the property in dispute, as testified to by Engineer George H. Steidle, would enable a jury to frame an intelligent verdict without the aid of the writ, and, because of that fact, it was error to decline to submit the case to the jury on the sole ground that the plaintiff had failed to put his writ in evidence. Besides, after trial and verdict, a record may be amended so that the pleadings will conform exactly with what was tried: Act of March 14, 1872, P. L. 25; Parks v. Boynton, 98 Pa. 370; Harris v. Pittsburgh & Lake Erie Ry. Co., 11 Pa. Superior Ct. 6.

But the defendant was, nevertheless, entitled to a direction in her favor on the first ground stated in the motion, because of the evidence which was given in the case on the part of the plaintiff himself. Both parties claim title from the same common source, to wit, the Pottsville Land and Improvement Company, a corporation. On Sept. 30, 1909, the said company conveyed to John O. McMenamin a lot of ground then in the Borough of Pottsville, now City of Pottsville, situate on the south side of Worman Street, "beginning at a point on the northeast corner of lot No. 7, sold to Mrs. William Bankes; thence south along the line dividing lots Nos. 7 and 6 to the Schuylkill River; thence eastwardly at right angles to the said dividing-line and along the said river 50 feet; thence northwardly parallel with the line dividing this lot from the Bankes lot to Worman Street; thence westwardly along Worman Street 50 feet to the place of beginning; containing in front on Worman Street 50 feet and in depth to the Schuylkill River, being the western ten feet of lot No. 4 and the whole of lots Nos. 5 and 6 on the plan of lots surveyed for" said company by William Pugh.

On Feb. 5, 1924, McMenamin conveyed to the plaintiff in this case thirty feet of said ground, the same being described as follows: "Beginning at a point on the northeast corner of lot No. 7, sold to Mrs. Elizabeth Bankes; thence south along the line dividing lots Nos. 7 and 6 to the Schuylkill River; thence eastwardly at right angles to said dividing-line and along said river 30 feet; thence northwardly parallel with the line dividing lot No. 6 from

the Bankes lot to Worman Street; thence westwardly along Worman Street 30 feet to the place of beginning; containing in front on Worman Street 30 feet and in depth to the Schuylkill River, being the western ten feet of lot No. 5 and the whole of lot No. 6."

On Nov. 11, 1910, the said company conveyed to Mrs. Elizabeth Bankes two lots in said borough, bounded on the north by Worman Street, on the east by lot of John O. McMenamin, south by the Schuylkill River and on the west by land of H. L. Miller; containing in front on Worman Street each lot 20 feet, making 40 feet all together and in depth to the river, being two lots Nos. 7 and 8 on the plan of lots surveyed for said company by A. B. Cochran and Son, Engineers.

When Clayton Knoblauch bought from McMenamin in 1924, Henry Knoblauch, the plaintiff's father, looked after the buying of it for him, but the plaintiff had seen the property before he bought it and had looked it over. As he did so, he saw the improvements that Mrs. Bankes had made on her property, to wit, a dwelling-house and garage, and saw also the fences; and, after acquiring the property, the plaintiff rebuilt the fence between the house and garage of Mrs. Bankes. Henry Knoblauch testified that he had bought one-half of the McMenamin property for his son Clayton and one-half for his son Charles, thirty feet for each, but, after he purchased it, he and Mrs. Bankes measured the ground from fence to fence and could not get the sixty feet then; got only fifty-four or fifty-five feet from fence to fence. McMenamin had bought ten feet more before selling to the Knoblauchs. After Henry Knoblauch and Mrs. Bankes measured the lots, Knoblauch said to her that there was something wrong, and that he was going to have the lots surveyed. He did so and the survey resulted in this action of ejectment, in which the plaintiff claims that the defendant set her house and her garage over on the ground that McMenamin had owned before making a sale of the lots to Clayton Knoblauch and Charles Knoblauch. At the time of the survey, Mrs. Bankes claimed that her line was right. In fact, the plaintiff thought that he had the width of his lots until Mrs. Bankes began to build a bungalow on another lot that she owned. Henry Knoblauch testified that in January, 1924, as agent for the plaintiff, he went with McMenamin over the ground that he wanted to buy and that he saw the fences there, one on each side, and he saw the Bankes's house. In back of it was the old fence, running back to the garage that stood where cribbing now is, which was put there by Knoblauch himself, and back of the rear end of the fence was the garage of Mrs. Bankes. The garage was standing there when the land was bought by Knoblauch, and also the fence running back to the river. When Knoblauch saw the fences, the house and the garage, he made no inquiry as to whether they were on the line or not, but thought the fences were on the line, and, believing that the fences were on the line, he bought the property as it was there. Said deeds call for sixty feet, but he made no measurements to find whether there were sixty feet there or not at that time. We will here make quotations from his testimony.

"Q. You bought that field there, then, as you saw it fenced off? A. Fenced off, yes. Q. And you were told by the seller, McMenamin, you say, that there were sixty feet? A. Sixty feet. Q. You had no conversation with Mrs. Bankes at all, before you bought, about the lines of the property? A. No, not before I bought, I had no conversation with Mrs. Bankes." Before buying, he did not ask Mrs. Bankes whether the fence was on her line or either east or west of it. McMenamin had just told him he had three lots, sixty feet of ground, and that it was fenced in, and Knoblauch bought

the lots as they were fenced there. "Q. And you got the lots that were fenced off and have them in possession? A. I have what was fenced in, yes. Q. Just got exactly what was bought and Mrs. Bankes has no part of that; she has no title to any part of the lots that you bought from McMenamin within the fences, has she? A. Not according to the engineers. Q. I am not asking according to that? A. Give me the question again. (Question read.) A. Not within the fences; mine is all in between the fences. Q. You bought those fenced lots; the fences were not very good, but still they were visible on the ground there, and that ground you have now in possession, or your two sons, is that not so? A. Yes; that is, in between the fences." He had two sons and had been their agent or overseer in the purchases from McMenamin. He made no measurements until about a year after he bought the ground, and then it was only when Mrs. Bankes started to build a bungalow that he found he had only about fifty-four feet by measuring at right angles across the lots. He measured eastwardly from lot No. 7 to lot No. 4.

Mrs. Bankes built her house on lot No. 7 in 1910. It has a frontage of eighteen feet, and when it was staked out, John McMenamin was present and also a Mr. Hock, of the Land and Improvement Company, from whom she had bought the ground, and she says that she had bought it on Aug. 6, 1908. This was before McMenamin bought his. She had bought lots Nos. 7 and 8 and McMenamin bought east of her. According to her story, McMenamin bought fifty feet and later ten feet more. McMenamin even worked on the foundation of her house and built the fence, and there never was any dispute with him whatever about the ground. McMenamin built his house in 1909. He left a three-foot alley, and Mrs. Bankes built near the line as it was surveyed; she stayed six inches away from the line as it was staked because McMenamin told her not to crowd the line, and McMenamin put the fence up according to the surveyor's stakes. The surveyor told him that he was over on her ground when he put up the new fences, which had become dilapidated by the time Knoblauch bought. It was right on the line where she built her garage, and he built a stone wall at the side of her garage, under it, to prop it up. He also built a cribbing about two and one-half feet high where the fence had been. Cribbings are now substantially where the McMenamin fences stood and where the engineer's stakes were on Knoblauch's ground. She had forty feet in her two lots.

John McMenamin was called on behalf of the defendant and testified that he bought the property in 1909; that he got a surveyor; that he had the stakes put on the line and left a three and one-half foot alley between his foundation and the Bankes's line. He built his house in 1909 and moved into it in December of that year. Then he bought the other half of lot No. 4, so that he had three lots or sixty feet in front. He also built a fence from the Bankes's house in front and another back of it, and her house was about six inches from the line in front and about eight inches from the line in back, clear of the line on her own side. He testified that the stakes were set by George H. Steidle, the present plaintiff's surveyor. When he put up the fence, he put the posts on his side of the line, but right to the line. He also built a fence along the Schuylkill and in front of his lot. He lived there from December, 1909, until he sold to the plaintiff in 1924, and he never had any difficulty or any claim on Mrs. Bankes, nor did she make any on him. The alley that was there between him and Mrs. Bankes was his own, and he had a gate on it for his own use. Henry Knoblauch came to see him and he said he would not sell unless he could sell the whole place. He told Knoblauch that he owned three twenty-foot lots, Nos. 4, 5 and 6, but Knoblauch said it

did not look like sixty feet to him. Knoblauch examined the house and everything was satisfactory. Knoblauch saw the fences and everything. Saw the fences in the rear and on the east and the west. McMenamin told Knoblauch that the place had been surveyed by the borough engineer. He did not say whether the fences were on the lines or not. Knoblauch was there several times about it. McMenamin had two deeds; one was for lots Nos. 6 and 5 and half of No. 4, and the other was for half of lot No. 4, which he thinks he bought in January, 1910. The lots are numbered from east to west, from one to eight. Mrs. Bankes had her lots before he got his. He told Mrs. Bankes not to crowd the line when she built her house, because he did not want the water running from her roof and porch on to his side. He helped to dig the cellar and helped put up the foundation of concrete, and that was six inches west of the line that Steidle had given him as the line of his lots. "My stakes were there and the Bankes's house was built west of the line of stakes." The garage is substantially on the line.

Under such a state of facts, Knoblauch has no right of recovery. McMenamin and Mrs. Bankes having staked out a line between their properties, and each having put improvements on their respective properties according to the line so laid down, are mutually estopped from making any claim upon the ground occupied by the other, although the line may have been established by mistake or through ignorance of the parties. Where one advises and encourages another to enter upon, invest his money in, or expend his labor on land with the assurance that he will thereby acquire title to it, such a one will not be permitted afterwards to call in question such title, even though he acted in ignorance of his own right: Woodward v. Tudor, 81* Pa. 382; Putnam v. Tyler, 117 Pa. 570, 586; Thompson's Appeal, 126 Pa. 367, 373; Schuey v. Schaeffer, 130 Pa. 16, 22; Marshal v. Foltz, 221 Pa. 570, 576. See, also, Com. v. Moltz, 10 Pa. 527, and Millingar v. Sorg, 55 Pa. 215.

It, therefore, appears that while we may have erred in granting the motion on the second ground stated by the defendant at the time of the trial, the defendant, nevertheless, was entitled to a verdict on the first ground stated by her counsel, so that no error was made in directing a verdict.

The motion in arrest of judgment and for a new trial is overruled, and the prothonotary is directed to enter judgment in favor of the defendant upon payment of the jury fee. From M. M. Burke, Shenandoah, Pa.