## Frey Brothers v. Dougherty et al.

*Religious associations—Bill in equity to subject real estate to the payment of debt—Act of May 20, 1913, P. L. 242.*

1. A bill in equity to subject real estate held by a trustee for an unincorporated religious association to the payment of a debt, alleged to be for work and materials in the improvement of the real estate, is defective which does not set forth an express contract or a ratification of an irregular contract by a majority of the lay members of the congregation at the regularly stated meeting.

2. A bill in equity is defective which does not allege that the congregation authorized the expenditure of money in accordance with the acts of assembly which place the control of real estate in the hands of the lay members of a congregation or a religious society.

Demurrer. C. P. Northampton Co., Feb. T., 1924, No. 1, in Equity.

*William H. Schneller* and *Smith, Paff & Laub*, for plaintiffs.

*Daniel C. Donoghue*, of the Philadelphia County Bar, and *E. J. & J. W. Fox*, for defendants.

*Edgar C. Nagle*, for beneficial society.

STEWART, P. J., Jan. 12, 1925.—The present bill in equity is filed against Cardinal Dougherty, Archbishop of the Diocese of Philadelphia; Our Lady of Hungary Church, Northampton, Pa.; Rev. Paul Repchik, priest; Louis Cornfindt et al., alleged to be officers or members of Our Lady of Hungary Church; St. Peter and Paul Roman Catholic Sick and Beneficial Society of

Northampton, Pa.; Andrew Yurashitz et al., alleged to be officers and members of St. Peter and Paul Roman Catholic Sick and Beneficial Society.

The bill alleges that the defendant Repchik is the priest of Our Lady of Hungary Church, Northampton; that the Parish of Our Lady of Hungary Church includes certain properties referred to in the bill, the title to which is vested in the defendant, Cardinal Dougherty, as Archbishop of Philadelphia; that the defendants, Louis Cornfindt et al., are officers or leading members of Our Lady of Hungary Church; that the complainants made repairs and improvements to the property of the church while the same was in the enjoyment of the lay members of the church, and that a part of the property, to wit, the community house, has since been conveyed by Cardinal Dougherty to St. Peter and Paul Roman Catholic Sick and Beneficial Society, the members of which are lay members of Our Lady of Hungary Church, enjoying and possessing the benefits of complainants' improvements and repairs to the buildings; that the material and improvements were furnished by the complainants for the benefit of the lay members of Our Lady of Hungary Church, who have, since the completion of the improvements and repairs, been enjoying the benefit and use thereof; that the complainants installed certain plumbing work and fixtures in the buildings and caused certain repairs to be made on the real estate on the dates and in the quantities set forth in Exhibit A attached to the bill; that the complainants furnished the water system to supply water to all of the buildings embraced in the parish, including the pump, tank, etc.; that the claim is for a balance of $7185.56, demand for which has been heretofore made and payment refused; that the complainants endeavored to collect the balance by separate actions against Rev. Bernard Somers, a former priest of the church, and Cardinal Dougherty, but on the trial thereof a compulsory non-suit was entered against the complainants in both cases.

The bill prays: 1. That Cardinal Dougherty be decreed the dry trustee for the real estate in the bill. 2. That the absolute ownership of the real estate be decreed to be in the congregation of Our Lady of Hungary Church and the society known as St. Peter and Paul Roman Catholic Sick and Beneficial Society. 3. That payment of the sum of $7185.56, with interest, be decreed to be made by the defendants to the complainants. 4. That the real estate described in the bill be impressed with a trust in favor of the complainants for the amount claimed by them. 5. That judgment be entered in favor of the complainants and against the defendants in the sum of $7185.56, with interest from Aug. 23, 1919, which judgment shall be decreed to be a lien against the real estate described in the bill. 6. That the real estate be subjected to the lien of such judgment and be permitted to be sold under legal process to satisfy the complainants' claim. Each of the defendants or representatives of class defendants have filed demurrers to the bill, all defendants assigning as causes for demurrer that upon the face of the bill the complainants are not entitled to any relief, as the bill does not disclose any liability to the complainants by any of the defendants; that the complainants have not averred any contract or agreement with the defendants entitling the complainants to the relief sought. The demurrer of Cardinal Dougherty also sets forth that upon the face of the bill it appears that the subject-matter of the litigation has been adjudicated in his favor. As each side attaches importance to the non-suits that were entered in the actions of assumpsit against Cardinal Dougherty and the Rev. Bernard Somers, a former priest of Our Lady of Hungary Church, and as those cases were tried before us, we briefly refer to them. The suit against Cardinal Dougherty was heard in full. That

against the Rev. Bernard Somers merely followed the decision in the former case. On that trial we opened the door very widely for the plaintiffs and permitted them to introduce in evidence all that they had to offer. Cardinal Dougherty appeared on the stand and was examined and cross-examined. It appeared conclusively that he had nothing to do with the making of any contract, and it also appeared in that trial that the only person who acted was the Rev. Bernard Somers. There was no evidence of any action either by Our Lady of Hungary Church or by the St. Peter and Paul Roman Catholic Sick and Beneficial Society of Northampton, Pa., nor was there anything to show any ratification of the alleged contract. In fact, as to a piece of machinery, the exact name of which has escaped us, but the cost of which constituted a large item in the account, there was serious dispute as to whether it had been accepted, and the defendants were willing that the complainants should take it away from the property. The learned counsel for the plaintiffs, in their brief filed, justify the inclusion of the thirteenth paragraph by the argument that the defendants' conduct was inequitable and that it "should not meet with the approval of the court sitting in equity." They further say that the defendants at that time urged the bringing of the bill in equity. The complainants' counsel now urge that the action of the court in entering a compulsory non-suit must be considered as *res adjudicata.* There is nothing in either of these positions. The actions at law and the present action are entirely independent of each other, and further discussion of the matter is unnecessary. In Finletter *v.* Appleton, 195 Pa. 349, the syllabus is: "Pleadings in equity, like those at law, should show a good cause of action. Every material fact on which the plaintiff relies for relief must be distinctly and clearly averred, and that, too, with reasonable fullness and certainty. If he does not disclose in his bill a cause of action against the defendant, the latter cannot be called upon to reply or to defend." See, also, Thompson's Appeal, 126 Pa. 367; P. S. V. R. R. Co. *v.* P. & R. Ry. Co., 160 Pa. 277; Luther *v.* Luther, 216 Pa. 1; Rittenhouse *v.* Newhard, 232 Pa. 433, and Spangler Brewing Co. *v.* McHenry, 242 Pa. 522. In Getty & Morris *v.* Pennsylvania Institution for the Instruction of the Blind, 194 Pa. 571, the syllabus is: "A demurrer to a bill in equity admits the averments of the bill, but does not admit argumentative conclusions or doubtful inferences from undisputed facts:" Gilkeson *v.* Thompson, 210 Pa. 355; Kaufmann *v.* Kaufmann, 222 Pa. 58. The learned counsel for the Sick and Beneficial Society especially contends that under the first cause of demurrer the bill is multifarious, and that as the bill sets forth in the fourth and sixth paragraphs that the property has been conveyed by Cardinal Dougherty to the society, and as the society is incorporated, no decree could now be entered against its land. We have not examined this matter with care, nor are the dates of the transfer given in the bill, nor is the fact that the society was incorporated mentioned in the bill, but under the averments of identity and community of interests on the part of the defendants, it does not seem to us that the bill is multifarious. Where the attempt is to reach property in the hands of a trustee upon the contract of an unincorporated religious association, it would seem to us that a suit in equity is proper under Wolfe *v.* Limestone Council No. 373, 233 Pa. 357, and other well-known cases. However, as held in the cases cited above, the bill must set forth either an express contract or a ratification of an irregular contract before the trust property can be bound. The present bill is utterly deficient under the above authorities in these respects. The pleaders, evidently having in mind the failure to prove action on the part of the congregation, stated their case "that the plaintiffs being duly authorized thereto" in

the sixth, ninth and tenth paragraphs, but such expressions are totally insufficient. The complainants must set forth, especially in the case of a religious association, that a majority of the lay members of the congregation, at a regularly stated meeting, authorized the contract. Whether Cardinal Dougherty is a dry trustee or, as contended by the learned counsel for him, that by reason of the Act of May 20, 1913, P. L. 242, he becomes an active trustee, makes no difference. His position seems to be well determined in Pennsylvania. In Carrick v. Canevin, 243 Pa. 283, the syllabus is: "A Roman Catholic bishop holding title to land for the use of a congregation has neither interest in the estate nor power to control it or direct its management; he has no duties to perform and no discretion, but is simply a passive, silent depository of the legal title, without interest and without power." In St. Joseph's Lithuanian Roman Catholic Church's Petition, 270 Pa. 73, the syllabus is: "Under section 7 of the Act of April 26, 1855, P. L. 323, 330, and its amendments, the trustees of a church property hold but the legal title thereto, the entire beneficial interest being in the congregation. All the lay members of a church are entitled to vote upon questions relating to the control and disposition of the church property." Mr. Justice Simpson summarizes the matter as follows: "It is further averred that at the meeting 'it was unanimously resolved that your petitioner be authorized to make application to the court' for authority to make the loan; but it is not stated how many were present, how many voted or what constituted a quorum. Since the petitioners are but dry trustees holding the legal title, and 'the entire beneficial interest is in the congregation, to be used by it, at its discretion, for such purposes as the law allows' (Krauczunas v. Hoban, 221 Pa. 213; Mazaika v. Krauczunas, 229 Pa. 47; Carrick v. Canevin, 243 Pa. 283), and since, also, this limitation extends to forbidding the use of the church money, even for religious purposes, without the consent of the congregation (Tuigg v. Treacy, 104 Pa. 493, 500), it follows that the petition was inadequate and doubtless would have been so held by the court below had objection been specifically made on this ground." At the conclusion of his opinion he states that the case was not decided under the Act of May 20, 1913, P. L. 242, and the Supreme Court declined to pass on that act, but in the very late case of Zernosky v. Kluchinsky et al., 278 Pa. 99, the Supreme Court did pass on that act, and Mr. Justice Kephart said: "To fix to a certainty the internal deportment relative to these matters, and in keeping with underlying fundamental legal principles, the Act of May 20, 1913, P. L. 242, was passed. In terms, it holds that whenever any property, other than funds from plate, Christmas and Easter collections and annual voluntary contributions, shall be given or conveyed to any church, it shall be held subject to the control and disposition of the lay members of the church, or of such constituted officers or representatives thereof as shall be chosen by a majority of lay members, citizens of Pennsylvania, which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body or organization to which such church, congregation or religious society shall belong. The purpose was to clarify and explain what was generally understood as being contemplated by the Act of 1855. Church property should be controlled in accordance with the rules, regulations and discipline of the particular denomination to which it belongs, limited by the Act of 1855; it makes the lay members, acting in obedience to church law, a necessary part of its control. Absolute dominion of all property is not placed in ecclesiastical authorities, even where their laws so provide. It is to be taken and held by the lay members, who administer it according to the

canons of the church; but, in administering it, both must act where the canons of the church provide for definite control in the clergy or other officials." It was also passed on by the Supreme Court in St. Joseph's Lithuanian Roman Catholic Church's Petition, 273 Pa. 486, where it was held the Revised Price Act of June 7, 1917, P. L. 388, repealed the Act of 1913, under a proceeding brought under the prior act. In addition to the above cases, those interested will find full discussions in Krauczunas v. Hoban, 221 Pa. 213; Mazaika v. Krauczunas et al., Trustees, 229 Pa. 47; Ryan v. Dunzilla, 239 Pa. 486; Novickas et al. v. Krauczunas et al., 240 Pa. 248, and Novicky v. Krauczunas, 245 Pa. 86. A study of the above cases shows conclusively the necessity of averring in the pleadings, and of proving on the trial, the active participation of the members of a congregation in the making of contracts. In Freeport Bank v. Egan et al., 146 Pa. 106, a suit at law brought against a building committee of a Roman Catholic Church for money expended about the erection of the church, and where, as in the present case, a portion was paid on account of the contract, the plaintiff was non-suited. It appeared that the work was ordered by Father McEnrue. The title to the real estate was in the bishop. Mr. Justice Mitchell summarizes the matter as follows: "In short, notwithstanding the occasional use of ambiguous words, such as instruction, assistance, authority, etc., the fair result of McEnrue's testimony is that the committee was not in charge of the work, or clothed with any duty or power in regard to it, but was merely a shifting, informal body for consultation and advice; while the real power and authority remained with McEnrue, who was the principal throughout as to the debts, including the one in suit." It would seem to us that that case was very like the present one, where the work was all ordered by Father Somers. See, also, Tuigg, Trustee, &c., v. Treacy, 104 Pa. 493, where a priest advanced certain moneys in the building of a church with the consent of his bishop, but the expenditures were made without the consent of the congregation. Mr. Justice Clark said: "Whether or not, therefore, Father Treacy paid and expended the money of St. Bridget's and his own in the St. Joseph's mission at the instance and request of the bishop is not important, as the bishop had no more right to pledge the credit of the congregation in an enterprise which it had not undertaken or assumed and in which it had no particular concern, or to divert the funds of the congregation from their proper use, than the pastor himself, and neither, it would appear, had any such power." There is nothing in the bill to show that the congregation ever authorized the expenditures sued for, nor is there anything in the bill to show that there was any ratification by the congregation. It is true that in the seventh paragraph it is alleged: "That the work, material and improvements as hereinafter set forth were furnished by the plaintiffs for the use, benefit and enjoyment of the lay members of Our Lady of Hungary Church, who have, since the time of the completion of such improvements and repairs up to this time, been enjoying the benefit and use thereof." But that allegation is not the equivalent of an allegation of ratification. We have already referred to the fact that there is a dispute as to one large item. Of course, that is not in this record, but it may fairly be referred to as an illustration of the impossibility of ratification of a contract such as the one in suit. It could not be pretended that the use of water from the pump, or taking a bath, or any number of baths, could be held to be a ratification. Ratification must be the recognition of a contract which was illegal, which was made legal by the action of the congregation acting as a unit, and not by the action of the individual members. A very helpful case is Bright v. Ruthenian Greek Catholic Congregation, 246 Pa. 156, where the

Frey Brothers *v.* Dougherty et al.

Supreme Court set forth fully what is necessary for a formal ratification of the acts of alleged agents of a corporation. The bill, therefore, is utterly deficient in the requisite averments to hold that the real estate in suit is liable for the payment of the complainants' claim.

And now, Jan. 12, 1925, this cause came on to be heard at this term and was argued by counsel, and it is ordered, adjudged and decree that the first, second and third causes of the defendants' demurrers be allowed and that complainants' bill be dismissed with costs. The prothonotary will enter this decree *nisi* and give notice of same to parties or their counsel, and if no exceptions are filed within ten days, this decree shall be entered by him as a final decree.

From Henry D. Maxwell, Easton, Pa.